IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLEGHENY ENTERPRISES, INC. | : | Case No. 4:10-cv-02539 |
| | : | |
| Plaintiff | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | |
| J-W OPERATING COMPANY, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

March 5, 2014

For the reasons that follow, the motion for summary judgment of plaintiff

Allegheny Enterprises, Inc. (Jan. 25, 2013, ECF No. 63) is granted in part and

denied in part, and the motion for summary judgment of defendant J-W Operating

Company (Jan. 28, 2013, ECF No. 66) is granted in part and denied in part, in

accordance with the accompanying Order of this date.

**I.     General Background**

This case was removed to this Court on December 15, 2010. The Court's

basis for jurisdiction is the parties's diverse citizenship. Pennsylvania law applies.

On August 17, 2012, plaintiff Allegheny Enterprises, Inc. (hereinafter,

"Allegheny") filed an amended complaint seeking declaratory judgment (counts I

& II), and asserting claims of conversion (count III), intentional interference with

contractual relations (count IV), and interference with coal interests (count V)

against defendant J-W Operating Company (hereinafter, "J-W Operating").[1] (Am.

Compl., Aug. 17, 2012, ECF No. 53 (hereinafter, "Am. Compl.")). Allegheny's

claims all substantially rest on its assertion that it owns "the coal, shallow gas and

oil and the related rights" under lands that Allegheny refers to as the "Pardee

Tract" and the "Jones/McConaghay Properties," while J-W Operating owns the

"deep gas and related rights" under the same lands, having acquired such rights by

assignment from Allegheny.  (Am. Compl. ¶¶ 11, 17). Allegheny contends that, by

the terms of a series of agreements with J-W Operating, its coal and shallow gas

and oil rights are superior to the deep gas rights it assigned to J-W Operating

(Id. ¶¶ 36, 42), and that J-W Operating has infringed (and threatens to further

infringe) upon Allegheny's rights by drilling ahead of Allegheny. Moreover,

---

[1]Allegheny originally named Cohort Energy Company (hereinafter, "Cohort") as a defendant in this case, but Cohort merged with J-W Operating during the pendency of this litigation. On April 5, 2012, the Honorable Robert D. Mariani, who was then presiding over this matter, ordered the case style amended to "remove reference to Cohort" and held that "J-W Operating Company shall stand in the shoes of Cohort Energy Company to the extent of claims against Cohort Energy Company by Plaintiff and to the extent of counterclaims by Cohort Energy Company against Plaintiff." (ECF No. 48). Unless clarity requires the Court to refer to Cohort separately, the Court's use of "J-W Operating" should be interpreted to include Cohort.

argues Allegheny, J-W Operating must, irrespective of specific terms of the parties's agreements, compensate Allegheny for the coal J-W Operating's drilling has rendered inaccessible. (Id. ¶¶ 51-53).

On August 31, 2012, J-W Operating answered and asserted counterclaims against Allegheny, including breach of warranty (counterclaim count I), fraud (counterclaim count II), and requests for declaratory judgment (counterclaim count III) and counsel fees (counterclaim count IV). J-W Operating's counterclaims all substantially rest on its assertion that, when the series of agreements between J-W Operating and Allegheny are considered together, J-W Operating's deep gas rights are in no way inferior to Allegheny's coal and shallow gas and oil rights. To the extent that the Court rejects this assertion, J-W Operating further asserts that various misrepresentations made by Allegheny formed the basis of bargains underlying various agreements between Allegheny and J-W Operating, all to J-W Operating's detriment. (Answer & Countercl., Aug. 31, 2012, ECF No. 54 ¶¶ 61-86).

On January 25, 2013, Allegheny filed a motion for summary judgment on counts I and II (declaratory judgment), III (conversion), and V (interference with coal interests) of its amended complaint, as well as on J-W Operating's counterclaims I (breach of warranty) and II (fraud). (ECF No. 63). On January 28,

2013, J-W Operating cross-moved for summary judgment on Allegheny's counts I,

II, III, and IV (intentional interference with contractual relations), and its own

counterclaim counts I, II, and III (declaratory judgment). (ECF No. 66).

## II.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the

outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that

a reasonable jury," giving credence to the evidence favoring the nonmovant and

making all reasonable inferences in the nonmovant's favor, "could return a verdict

for the nonmoving party." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is

genuinely disputed must" be supported by "citing to particular parts of materials in

the record," or by "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly

support an assertion of fact or fails to properly address another party's assertion of

fact as required by Rule 56(c), the court may . . . consider the fact undisputed for

purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his evidence, if not controverted, would entitle him to judgment as a matter of law, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. See Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient. Anderson, 477 U.S. at 250.

Where the nonmoving party has had adequate time for discovery and will bear the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

When considering cross-motions for summary judgment, the Court considers each motion separately, applying the standard set forth above. See Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001)

(quoting <u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241, 245 (3d Cir. 1968) (cross-

motions for summary judgment "are no more than a claim by each side that it alone

is entitled to summary judgment"); <u>Benckini v. Hawk</u>, 654 F. Supp. 2d 310, 315

(E.D. Pa. 2009). The Court cannot view "facts" in the light most favorable to two

nonmoving parties simultaneously, and in some cases the best course may be to

recite two statements of "facts" for the same case or even to write entirely separate

opinions disposing of the respective motions. <u>See Interbusiness Bank, N.A. v. First</u>

<u>Nat'l Bank of Mifflintown</u>, 318 F. Supp. 2d 230, 236 (M.D. Pa. 2004) (Conner,

C.J.). The Court in this case has written a single opinion with a single recitation of

the facts because the factual disputes between the parties are few.

## III.   Facts

By a series of agreements it entered into between 2002 and 2004, Allegheny

became the owner of all of the coal under the Pardee Tract, which is located on

approximately 8,791 acres in Cameron and Elk Counties, Pennsylvania.

(Allegheny Facts, Jan. 29, 2013, ECF No. 69 ¶¶ 1-3 (hereinafter, "Allegheny

Facts")). Allegheny acquired the oil and gas rights associated with the Pardee Tract

in 2005. (Am. Compl. ¶ 8).

On March 27, 2008, Allegheny and J-W Operating entered into a "Lease

Purchase and Exploration Agreement" (hereinafter, the "Exploration Agreement").

(Allegheny Facts ¶ 4). In relevant part, the Exploration Agreement provided for J-W Operating to purchase Allegheny's interest in the "Deep Rights" associated with the Pardee Tract and other properties for $10 million and other consideration from J-W Operating. (Id. ¶ 5; Exploration Agreement ¶¶ 1.1(a), 1.3).

The "Deep Rights" were defined in the Exploration Agreement as:

> all of Allegheny's interests in the oil and gas, the oil and gas leases, lands and related acreage . . . that are below the stratigraphic equivalent of 4,000 feet below the surface . . ., including all surface rights and privileges necessary to explore and develop such Deep Rights, including but not limited to the use of all roads, sites and pads currently in place.

(Exploration Agreement ¶ 1.1(a)).

The Exploration Agreement also designated a certain "Coal Mining Area," or "CMA," consisting of an approximately 504 acre piece of the Pardee Tract.

(Id. ¶ 13.1; Allegheny Facts ¶ 5). With respect to the CMA, the Exploration Agreement provided:

> Prior to commencing any surface drilling activity or pipeline activity within the CMA, [J-W Operating] shall notify Allegheny of the planned activity and receive written approval of the planned well site and pipeline locations. Allegheny agrees that its approval of the activity will not be unreasonable [sic] withheld and shall be completed no more than fifteen (15) days after the receipt of such notice. [J-W Operating] acknowledges that Allegheny coal mining interests within the CMA will be considered superior until the mining within the CMA has been completed. No notification shall be required in the event that a horizontal wellbore or wellbores transverse the CMA at a depth deeper than the stratigraphic equivalent of the top of the Deep Rights, as defined herein.

(Exploration Agreement ¶ 13.2).

The Exploration Agreement also designated an "Area of Mutual Interest," or "AMI." In relation to properties located in the AMI, the parties agreed to convey to each other specified interests in "any oil, gas or mineral leases or oil, gas or mineral rights" acquired by either party in the future. (Id. ¶ 6.1 - 6.3). The Exploration Agreement provided for its terms to become effective at closing, when Allegheny would deliver to J-W Operating, among other things, "an Assignment . . . conveying the Deep Rights." (Id. ¶ 11.4(a)).

On April 1, 2008, Allegheny and J-W Operating consummated a "Partial Assignment and Conveyance" agreement (hereinafter, the "Assignment") that conveyed to J-W Operating the Deep Rights and certain incidental interests. (Allegheny Facts ¶ 7). The Assignment provided that it was "executed pursuant to and subject to the terms of" the Exploration Agreement,[2] and that "[i]n the event of any conflict or inconsistency between the terms and provisions" of the Assignment

---

[2]The Assignment actually provides that it "is executed pursuant to and subject to that certain Lease Purchase and Exploration Agreement effective February 1, 2008, between [Allegheny] and [J-W Operating] (the 'Exploration Agreement'). In the event of any conflict or inconsistency between the terms and provisions hereof and the terms and provisions of the Exploration Agreement, the terms of the Exploration Agreement shall control." Despite the reference to a February 1, 2008 effective date, the parties seem to agree that the agreement referenced is the Exploration Agreement.

and the terms and provisions of the Exploration Agreement, the terms of the

Exploration Agreement "shall control." (Assignment ¶ 2).

Approximately two years later, on March 30, 2010, Allegheny and J-W

Operating consummated a "Termination and Assignment Agreement" (hereinafter,

the "Termination Agreement"). (Allegheny Facts ¶ 8). Among other things, the

Termination Agreement provided for the termination of the Exploration

Agreement, with the exception of the Exploration Agreement's "representations,

warranties and indemnities." (Termination Agreement ¶ 1). The Termination

Agreement also designated an "Area of Interest." In relation to properties located

in the "Area of Interest," the parties agreed to convey to each other specified

interests in any lease acquired by either party in the future. (Id. ¶ 3-4).[3]

---

[3]In relation to its breach of warranty and fraud claims, J-W Operating notes
that, among the Exploration Agreement's representations and warranties preserved
by the Termination Agreement is Allegheny's representation that, "[t]here are no
contracts or agreements to which the [Deep Rights], or any portion thereof, are
subject other than those described on Exhibit 'B' [which says '[t]here are no
contracts or agreements to which the [Deep Rights] are currently subject to [sic] at
the time of closing]." (J-W Operating Facts, Feb. 19, 2013, ECF No. 76 ¶ 3
(hereinafter "J-W Operating Facts"); Exploration Agreement ¶ 3.6). Further, the
Termination Agreement itself includes representations and warranties providing
that "[u]nless disclosed to [J-W Operating] in writing together with a copy of the
pertinent document, Allegheny represents that none of the interests assigned
hereby is subject to the terms of any recorded or unrecorded contract or
agreement"; that "[t]o the best of [Allegheny's] knowledge and belief no member
of Allegheny has . . . (iv) encumbered, sold, abandoned, relinquished, or otherwise
disposed of any of the Deep Rights of the leases"; and that "[t]o the best of

In February 2010, Allegheny sought a permit from the Pennsylvania Department of Environmental Protection (hereinafter, "DEP") to mine coal in the area designated the "CMA" in the Exploration Agreement. (Allegheny Facts ¶ 14). In June 2010, J-W Operating sought a permit from the DEP to drill a well – called the "C-12H Well" – that Allegheny claims (J-W Operating disagrees) is positioned inside the CMA. (Id. ¶¶ 29, 30, 31, 36; J-W Operating Facts ¶¶ 21, 22, 28). On November 22, 2010, with Allegheny's coal mining permit still pending at the DEP, and twelve days after Allegheny filed the original complaint in this litigation, J-W Operating began drilling the C-12H Well without the approval of Allegheny. (Allegheny Facts ¶¶ 38, 39).[4] According to Allegheny (again, J-W Operating disagrees), the C-12H Well interferes with Allegheny's ability to extract coal from the CMA to the extent that 13,300 acres of coal (net value $726,180.00) are now

Allegheny's knowledge and belief, there are no contracts and agreements related to the Deep Rights of the leases except the leases themselves, the former exploration agreements related to the leases and this Agreement." (J-W Operating Facts ¶¶ 16; Termination Agreement ¶¶ 25.D., 25.N., 25.Q.)

J-W Operating claims that these provisions were misrepresentations because Allegheny indeed had entered into agreements with respect to the coal atop the Deep Rights that J-W Operating acquired.

[4]The parties's statements of fact agree that Allegheny and J-W Operating were in regular contact with each other and third parties throughout 2010 concerning the appropriate location of the C-12H Well.

inaccessible. (Id. ¶ 40).

## IV.  Discussion

## a.  Declaratory Judgment

Under Pennsylvania law, "[a]ny person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." 42 Pa. Cons. Stat. § 7533.

In support of its claim for declaratory judgment in its favor, Allegheny argues that the Assignment – by specifying that it was "executed pursuant to and subject to the terms" of the Exploration agreement – incorporated the Exploration Agreement, including the Exploration Agreement's terms respecting the CMA and J-W Operating's acknowledgment that "Allegheny coal mining interests within the CMA will be considered superior until the mining within the CMA has been completed." (Allegheny Supp. Br., Jan. 29, 2013, ECF No. 68 at 4 (hereinafter, "Allegheny Supp. Br.")). Although the Termination Agreement terminated the Exploration Agreement itself, argues Allegheny, the Termination Agreement did not terminate the Assignment's  incorporation of the Exploration Agreement, the

terms of which remain viable as part of the Assignment. (Allegheny Supp. Br. at 5). As a consequence, Allegheny's coal mining interests remain superior to J-W Operating's interest in the Deep Rights.

J-W Operating disagrees, arguing that the Assignment's "pursuant to and subject to" clause "was included for the express purpose of infusing a safeguard to avoid potential conflict or inconsistency with the Exploration Agreement and not, as [Allegheny] asserts, to incorporate by reference all terms of the Exploration Agreement for all time." (J-W Operating Opp'n Br., Feb. 19, 2013, ECF No. 77 at 4 (hereinafter, "J-W Operating Opp'n Br.") (emphasis in original)). Further, J-W Operating argues that had it been the parties's intention to have the Exploration Agreement's CMA-related provisions survive, then "appropriate language would have been employed [in the Termination Agreement to] express[] any such intention, just as the [Termination Agreement] allowed [the Exploration Agreement's] representations, indemnities and warranties to live on." (J-W Operating Opp'n Br. at 6). Ultimately, argues J-W Operating, because the Exploration Agreement's CMA-related provisions were not incorporated into the Assignment, and because the Termination Agreement terminated the Exploration Agreement (including its CMA-related provisions), a valid agreement on the superiority of Allegheny's coal mining rights neither exists now nor existed

between the parties when J-W Operating began drilling the C-12H Well.[5]

In assessing the parties's arguments, the Court is guided by the principles of Pennsylvania contract law. Contract interpretation is an "attempt to ascertain the intent of the parties and give it effect," and "[w]hen the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement." LJL Transp., Inc. v. Pilot Air Freight Corp., 599 Pa. 546, 962 A.2d 639, 647 (2009). Where the words are ambiguous, on the other hand, "parol evidence is admissible to explain or clarify or resolve the ambiguity." Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 588 Pa. 470, 905 A.2d 462, 468 (2006).

"A contract is ambiguous if it is reasonably susceptible of different constructions," id., yet contract interpretation is not concerned with parties's "post

---

[5]J-W Operating offers another reason as to why the Assignment does not make Allegheny's coal mining interests superior to J-W Operating's interest in the Deep Rights: the Exploration Agreement's CMA-related provisions are "collateral" to the Assignment and therefore not incorporated by it. (See J-W Operating Opp'n Br. at 5 (citing Dick v. McWilliams, 291 Pa. 165, 139 A. 745 (1927), and Raab v. Beatty, 96 Pa. Super. 574 (1929)). This argument fails. Whether provisions of a sales agreement are collateral to or merge with a subsequent deed is an issue relevant to the question of whether provisions of the sales agreement not incorporated by the deed nevertheless survive the deed. The question in the case at bar is whether or not the language of the deed (the Assignment) incorporated the provisions of the sales agreement and, if so, whether the incorporated provisions survive the Termination Agreement.

hoc judgment[s] ... as to what should have been," and the Court will not "rely upon a strained contrivancy" to establish ambiguity, Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 663 (1982). The Court, rather, seeks to be faithful to the meaning that the parties – given their positions at the time of contracting – would have given their words ex ante.

When determining whether the language of an agreement is clear or ambiguous, the Court assumes that the parties intended "all provisions in the agreement [to] be construed together and ... given effect." LJL Transp., 962 A.2d at 647. Indeed, where the parties execute several related agreements with the apparent intention that the agreements govern a single transaction collectively, the agreements should be construed as a single whole even when they are executed at different times. See Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) (applying Pennsylvania law); Giant Food Stores v. THF Silver Spring Dev., L.P., 2008 Pa. Super. 245, 959 A.2d 438, 447 (2008) ("although the four written instruments in question may have been executed at different times and do not in terms refer to each other, the First Letter Agreement, the Second Letter Agreement, and the First Amendment constitute one transaction. . . . Accordingly, we conclude it is proper for these written documents to be read together and each construed with reference to the other.").

14

In the case at bar, the Exploration Agreement, Assignment, and Termination Agreement should be construed with reference to each other. The Assignment and Termination Agreement both refer back to the Exploration Agreement, and the three agreements all purport to govern the parties's relationship as to their mutual interests in lands located in Cameron and Elk Counties. The only reasonable inference is that the parties contemplated the interaction of the agreements.

With these principles in mind, the Court considers the parties's disputes in turn.

First, Allegheny argues that the Assignment incorporated the Exploration Agreement in full (Allegheny Reply Br., Mar. 19, 2013, ECF No. 83 at 5 (hereinafter, "Allegheny Reply Br."))),[6] while J-W Operating argues that the Assignment incorporated the Exploration Agreement for only limited purposes. The language employed in the Assignment gives Allegheny the better of the argument. The Assignment, in the first sentence of paragraph "2," purports to be "subject to" various "terms, conditions and covenants," one of which is that the "Assignment is executed pursuant to and subject to the terms of that certain

---

[6]Allegheny later "concedes" that certain provisions of the Exploration Agreement may not have been incorporated into the Assignment, but this is not Allegheny's primary argument. (Allegheny Reply Br. at 5-6).

[Exploration Agreement]."[7] This language effectively incorporates the terms of the Exploration Agreement into the Assignment, apparently without limitation.

J-W Operating's argument that the second sentence of the Assignment's paragraph 2 is intended to limit the broad incorporation of the first sentence is untenable. That second sentence provides that, "[i]n the event of any conflict or inconsistency" between the terms of the Assignment and Exploration Agreement, the latter agreement controls. Given its natural sense, the sentence supplies a rule for construing provisions of the Assignment against conflicting provisions of the incorporated Exploration Agreement; the sentence does not purport to limit the scope of the incorporation itself.

Second, the parties dispute whether, by virtue of their incorporation into the

_____

[7]"Subject to" can take various meanings, but the natural sense of the term as used in the Assignment is "[d]ependent upon a particular correcting or modifying condition; conditional upon; resting on the assumption of." See "subject, adj. and adv." OED Online. December 2013. Oxford University Press. http://www.oed.com/view/Entry/192687 (accessed February 24, 2014). Other examples of this usage are legion. See, e.g., Carlisle v. Matson Lumber Co., 186 F. App'x 219, 221 (3d Cir. 2006) ("This Timber Deed was explicitly subject to the same conditions as the referenced 1968 Unrecorded Agreement. Thus, the Timber Deed was arguably subject to the same condition contained in the 1968 Unrecorded Agreement that the timber rights conveyed therein would terminate on April 1, 1978 . . ..");  Ringrose v. Ringrose, 170 Pa. 593, 33 A. 129, 133 (1895) ("the conveyance was absolute without any condition on its face, but by a brief reference to the agreement subject to which the conveyance was made all the stipulations of the agreement were imported into the deed with the same effect as if they had been written in the deed.").

Assignment, the CMA-related provisions of the Exploration Agreement survive the Termination Agreement, which terminated the Exploration Agreement excepting the parties's "representations, warranties and indemnities," but did not explicitly reference the Assignment. Allegheny argues that "the Termination Agreement only acted to terminate Allegheny and [J-W Operating's] continuing business relationship by which each had the right to participate in the other's gas and oil development activities"; it had no impact on the vitality of the CMA-related provisions as incorporated by the Assignment. (Allegheny Supp. Br. at 5). J-W Operating argues that the parties did not intend to give the Exploration Agreement eternal life through the Assignment; rather, the terms of the Exploration Agreement (exceptions aside) were rendered dead and buried by the Termination Agreement for all purposes.

Here, it is Allegheny's position that is untenable. If (as Allegheny argues) the Assignment incorporated the entire Exploration Agreement, and (as Allegheny further argues) the Termination Agreement was sufficient to "terminate [the] continuing business relationship" between Allegheny and J-W Operating, both as set forth in the Exploration Agreement and as incorporated by the Assignment, then there is no apparent reason why the Termination Agreement struck the CMA-related provisions only as set forth in the Exploration Agreement, and not as

incorporated by the Assignment.  In other words, the Termination Agreement either killed off all of the provisions (explicit exceptions aside) of the Exploration Agreement as incorporated by the Assignment, or none of them, but it could not, on any reasonable reading of its terms, have terminated some provisions and maintained others.

As for whether the Termination Agreement in fact killed off all or none of the Exploration Agreement as incorporated by the Assignment, the parties cite no caselaw (and the Court has discovered little more) discussing the scenario involved in this case: what happens when provisions of agreement "A" are incorporated into agreement "B," and agreement "C" modifies the provisions of agreement A, but agreement C does not address agreement B? Specifically, does agreement B's incorporation of agreement A "freeze" the terms of agreement A as they were at the time of incorporation; or does subsequent  modification of the terms of agreement A by agreement C effect a corresponding modification of agreement B? From what little relatively on-target precedent the Court has found, the answer properly lies in the parties's intentions as manifested by the terms of their agreements. See generally Morales v. PenTec, Inc., 57 Conn. App. 419, 749 A.2d 47, 58 (2000); R.S. Fling & Partners , Inc. v. Cent. Nat'l Bank, 1979 WL 209357, at *3 (Ohio Ct. App. Sept. 27, 1979). But see 11 Richard A. Lord, Williston on

Contracts § 30:23 (4th ed.) ("The rule providing for incorporation of existing law into contracts applies to the law existing at the time when the contract is executed. Thus, as a rule of construction, changes in the law subsequent to the execution of a contract are not deemed to become part of agreement unless its language clearly indicates such to have been intention of parties.").

In the case at bar, it is apparent that the parties intended to incorporate the Exploration Agreement as modified over time into the Assignment. If (as Allegheny argues) the Assignment incorporated the Exploration Agreement, it incorporated the Exploration Agreement's provision respecting modification generally – "This Agreement may not be modified or amended except by a writing or writings signed by the party against whom any modification or amendment is asserted or sought to be enforced" (Termination Agreement ¶ 14.7) – and modification of the CMA in particular – "Except for 11.3 [sic] above, the CMA shall not be modified without the express written consent of [J-W Operating]" (Id. ¶ 13.4). By incorporating the Exploration Agreement (including its provisions respecting modification) into the Assignment without qualification, the parties must have contemplated that modification of the Exploration Agreement in accordance with its terms (which the Termination Agreement apparently satisfied) would correspondingly modify the Assignment.  See Lord, supra, § 30:25 ("When

a writing refers to another document, that other document . . . becomes constructively a part of the writing, and in that respect the two form a single instrument. The incorporated matter is to be interpreted as part of the writing."). Accordingly, the Termination Agreement's modification of the Exploration Agreement – termination of all but the latter agreement's "representations, warranties and indemnities" – terminated the parties's CMA-related pacts for all relevant purposes. Cf. Morales, 749 A.2d at 58 ("The agreement clearly incorporates the medical plans that were in existence prior to the date of the agreement. Those plans all provided that the corporation could amend the medical reimbursement plan. We conclude that the plaintiff's benefits were governed by the provisions of the plan as amended and in existence at the time she incurred the bills for cosmetic surgery and dental work."). Allegheny's contrary interpretation of its agreements with J-W Operating is unconvincing.

Accordingly, Allegheny's motion for summary judgment should be denied as to counts I and II (each count seeking declaratory judgment); J-W Operating's motion for summary judgment should be granted as to its counterclaim III (declaratory judgment). Because J-W Operating predicated its claims against Allegheny for breach of warranty (counterclaim count I) and fraud (counterclaim count II) on the Court granting declaratory judgment in Allegheny's favor, the

Court will not consider J-W Operating's motion for summary judgment on these counterclaim counts.

**b.     Damages for Interference with Coal Interests**

Sitting in diversity, this Court is bound to follow the law as decided by the highest court of the Commonwealth of Pennsylvania. See Commercial Union Ins. Co. v. Bituminous Cas. Corp., 851 F.2d 98, 100 (3d Cir. 1988) ("As a federal court exercising diversity jurisdiction, we are bound in this case to follow the law as decided by the highest court of the [state]."). The parties vigorously dispute whether, regardless of the specific terms of any agreements between them, the Pennsylvania Supreme Court's decision in Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597 (1893), and following precedents, provide Allegheny with a damages remedy for the coal purportedly made inaccessible by J-W Operating's C-12H Well.

Controversy over the holding of Chartiers Block Coal in this regard is understandable; Chief Justice Paxson's 1893 opinion ponders more questions than it decides. At issue in the case was whether the owner of the coal estate (plaintiff) was entitled to an injunction against the lessee of rights to oil and gas located beneath the coal estate (defendant), "to restrain [defendant] from further drilling wells then commenced, and from drilling any other well or wells which would pass

through the coal." <u>Chartiers Block Coal</u>, 25 A. at 597. Plaintiff claimed that, in the absence of an injunction, defendant's drilling operations would "render[] the mine operations so hazardous to plaintiff's property and plaintiff's employes as to very greatly injure and depreciate the value of said coal property, if not wholly to destroy the value thereof." <u>Id.</u> Although the grantor of the coal estate (the lessor of the oil and gas estate), "reserved to himself no right, privilege, or easement in said coal, or any part thereof, and no right of way through said coal from the surface, to obtain gas or oil, or any other substance," <u>id.</u>, Chief Justice Paxson held that the right of the oil and gas lessee "to reach his estate below the coal exists at all times," <u>id.</u> at 599. In reasoning towards this conclusion, Chief Justice Paxson assumed that the oil and gas lessee's "right [to drill] may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining, and for every necessary interference with it the [lessee] must respond in damages." <u>Id.</u>

In spite of his reliance on the assumption that the owner of the coal estate would be entitled to damages, after affirming the oil and gas lessee's "right of access" to his estate, Chief Justice Paxson explicitly left open the "question [of] how that right shall be exercised, by what authority, and under what limitations." <u>Id.</u>  Ultimately, he concluded that given its complexity, this was "a legislative,

rather than a judicial, question." Id. Chief Justice Paxson's professed modesty did not keep him from offering guidance to the legislature, however: "In all such cases [where the oil and gas lessee seeks to drill through the coal estate above] there should be a petition to the court, and a decree regulating the mode of exercise of the right. There should also be a provision for the appointment of a jury of view to assess the damages. In this way the rights of the [lessee] can be preserved without any wrong to the owner of the coal." Id.

Chief Justice Paxson let stand the lower court's order requiring the defendant to give a $10,000[8] bond to the plaintiff, "conditioned that in putting down and operating any wells now in process of drilling, or which may hereafter be drilled under this decree, said defendants shall protect said coal and property of said plaintiff, and also the plaintiff's employes in and about said coal, from all damages by reason of said wells." Id. at 597. "[W]e will not disturb the decree of the court below," reasoned Chief Justice Paxson. "The appellant company has its remedy at law, and to that we will remit it." Id. at 600.

All of this is to say that the parties's disagreement over the holding of

---

[8]The United States Department of Labor Bureau of Labor Statistics's Consumer Price Index Inflation Calculator only goes as far back as 1913. In any event, $10,000 in 1913 had the same buying power as $236,278.79 in 2014. Ten-thousand dollars in 1893, when Chartiers Block Coal was decided, would presumably have even more buying power today.

<u>Chartiers Block Coal</u> is reasonable.

Yet even assuming that the Pennsylvania Supreme Court in <u>Chartiers Block Coal</u> did not hold that the oil and gas lessee must compensate the owner of the above-located coal estate for coal made inaccessible by drilling, that does not end this Court's inquiry. "In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case." <u>Berrier v. Simplicity Mfg., Inc.</u>, 563 F.3d 38, 45-46 (3d Cir. 2009).

This Court predicts that the Pennsylvania Supreme Court would hold that an oil and gas lessee must compensate the owner of an above-located coal estate for otherwise useful coal rendered inaccessible by oil and gas drilling. This prediction is supported (if not compelled) by <u>Chartiers Block Coal</u>. It also comports with the industry's likely expectations based on other courts's interpretation of <u>Chartier Block Coal</u> over the following century. <u>See, e.g., Einsig v. Pennsylvania Mines Corp.</u>, 69 Pa. Commw. 351, 452 A.2d 558, 565 (1982) ("Both <u>Chartiers</u> and the [Gas Operations Well-Drilling Petroleum and Coal Mining ] Act leave the reader with certain definite impressions: (1) The drilling of any well constitutes interference – <u>Chartiers</u> distinguishes between 'wanton' interference, which will be prevented by the interception of equity, and 'necessary' interference, for which the

driller must respond in damages."); <u>Shearer v. Rochester & Pittsburgh Coal Co.</u>, 20 Pa. D. & C.3d 67, 75 (1981) ("The actual conclusion reached by the court in [<u>Chartiers Block Coal</u>] was that the owner of the coal had a right to damages, 'for every necessary interference with it' by the surface owner or someone claiming under him."); <u>Monongahela River Consol. Coal & Coke Co. v. Greensboro Gas. Co.</u>, 20 Pa. D. 320, 325 (1910) (requiring defendant to "give bond in the sum of $10,000, with surety to be approved by the court, conditioned to pay all damages that may be recoverable legally by the plaintiff from the defendant by reason of the existence and operation of the gas well now being drilled, or of the wells hereafter to be drilled through said coal stratum").

Imposing liability on oil and gas drillers is also likely to be beneficial from a public policy point of view, a consideration important to the Pennsylvania Supreme Court . <u>See generally Chartiers Block Coal</u>, 25 A. at 599 ("Abounding, as our state does, with these mineral treasures, so essential to our common prosperity, the question we are considering becomes of a <u>quasi</u> public character. It is not to be treated as a mere contest between A. and B. over a little corner of earth."). If there is a tradeoff between using a given plot of land for producing coal on the one hand and oil and gas on the other, the Court should encourage efficient use of the land.

Hypothetically, if the land in question in the case at bar was owned by a

single corporation able to extract coal with the same facility as Allegheny and to extract deep oil and gas with the same facility as J-W Operating, that corporation would sensibly extract coal up to the point where it was more valuable to it to extract oil and gas, and then switch to extracting oil and gas  (conversely, the corporation would extract oil and gas up to the point where it was more valuable to it to extract coal, and then switch to extracting coal).[9] But with ownership of the coal and deep oil and gas rights divided – the coal rights in Allegheny and the deep oil and gas rights in J-W Operating – J-W Operating's incentive is to drill for deep oil and gas irrespective of the cost to Allegheny in lost access to coal; likewise, Allegheny's incentive is to mine coal irrespective of the cost to J-W Operating in lost access to oil and gas. Relative to the single corporation's sensible approach to production, divided interests in the land's strata can result in a potentially wasteful outcome because each owner seeks to maximize profits only on his part of the land, costs to other interests be damned.

If the parties could easily negotiate and monitor each other's conduct, then they could reach a deal mirroring the single owner's sensible use of land by paying each other to change behavior (e.g. the owner of the coal stratus could ask the

---

[9]It is, of course, possible that conditions are such that it never becomes advantageous for the single corporation to switch from coal to oil and gas or oil and gas to coal.

owner of the deep oil and gas stratus to place his well where the least amount of coal will be sacrificed, compensating the owner of the deep oil and gas stratus with a portion of the value of his coal). But if negotiation is difficult, as it often is, the parties may not reach such an agreement, and the Court is in a position to prevent waste by pushing them towards behavior they would have undertaken under more propitious circumstances.

The Court can increase efficiency by placing liability on the party who can change its behavior at the least cost, which in most cases like this one is probably the party seeking to drill for oil and gas.[10] See generally 58 Pa. Cons. Stat. § 601.202(c) (valid up to Apr. 15, 2012) (providing, in the case of a coal owner's objections to the location of an oil and gas well, for the well to be relocated "as near to the original location as possible where, in the judgment of the [Department of Environmental Resources], the well can be safely drilled without unduly interfering with or endangering such mine "). Accordingly, this Court predicts that

---

[10]Of course, if the owner of the coal stratum can change its behavior more cheaply, then placing liability on the oil and gas lessee will not promote efficiency and the liability burden should be reversed. To the extent negotiation costs are not prohibitive, and there is some evidence that they are not, see Belden & Blake Corp. v. Commonwealth, Dept. Of Conservation & Natural Res., 600 Pa. 559, 969 A.2d 528, 534 n.1 (2009) (Saylor, J., dissenting) ("[C]ourts have recognized that surface and subsurface owners generally address the terms on which mineral rights holders' easements will be effectuated via agreements"), the parties may be able to negotiate back to relative efficiency.

the Pennsylvania Supreme Court would hold that an oil and gas lessee must

compensate the owner of an above-located coal estate for otherwise useful coal

rendered inaccessible by oil and gas drilling.

J-W Operating's arguments (see J-W Operating Opp'n Br. at 12-13) against

liability for the useful coal its operations render inaccessible are unconvincing. J-

W Operating's first and third arguments – that statutes such as the Oil and Gas Act

have entirely displaced the common law in this area of commerce – ignores the

general rule that "[s]tatutes are never presumed to make any innovation in the rules

and principles of the common law or prior existing law beyond what is expressly

declared in their provisions." Rahn v. Hess, 378 Pa. 264, 106 A.2d 461, 464

(1954). The Court sees little if any indication in the Oil and Gas Act that the

Pennsylvania legislature intended to regulate economic, as opposed to health and

safety, aspects of the relationship between coal and oil and gas producers. See,

e.g., 58 Pa. Cons. Stat. § 601.102. Moreover, the Pennsylvania Supreme Court has

indicated relatively recently that Chartiers Block Coal lives on side-by-side with

statutes since enacted. See Belden & Blake, 969 A.2d at 532.

J-W Operating's second argument – that the Commonwealth Court's opinion

in Einsig holds that, after a series of legislative enactments regulating the

relationship between owners of coal and oil and gas strata, "the only state law

claims that remain viable are contract-based claims" – rests on a misreading of

Einsig. In that case, the Commonwealth Court explained:

> The consideration of rights <u>flowing from contracts of sale</u> are best addressed by a court of common pleas, and not by [the Department of Environmental Resources, administrator of what was then called the Gas Operations Well-Drilling Petroleum and Coal Mining Act], whose expertise does not extend to the analysis of chains of title and the limitations therein. The proper court could determine to what degree, if any, the surface owner/driller 'must respond in damages' for problems caused by the well. <u>Chartiers</u>, 152 Pa. at 297, 25 A. 597.

Einsig, 452 A.2d at 568 (emphasis added). J-W Operating apparently reads this as

allowing damages to the owner of the coal estate only when damages are expressly

provided for by contract. But this facially plausible reading is wrong because the

court in <u>Einsig</u> uses the term "flowing from contracts of sale" in the same sense as

the Pennsylvania Supreme Court did in <u>Chartiers Block Coal</u>. <u>See Einsig</u>, 452 A.2d

at 565 (emphasis added) ("Rights other than those regulated by the Act exist

between the parties – <u>Chartiers</u> refers to them as '<u>growing out of a contract of</u>

<u>sale</u>'").

The <u>Chartiers Block Coal</u> court had reasoned that the purchaser of the

subsurface possesses a right of access "to remove the product thereof," explaining

that this "is a right <u>growing out of the contract of sale</u>, the position of the <u>stratum</u>

sold, and the impossibility of reaching it in any other manner." 25 A. at 598

(emphasis added). But, as explained <u>supra</u>, the entire discussion in <u>Chartiers Block</u>

<u>Coal</u> involved the parties's rights – of one party to access its stratum and the other to damages – <u>in the absence</u> of specific contractual provisions setting forth the relationship of owners of various strata. <u>Id.</u> ("The difficulty is to so apply the law as to give each owner the right of enjoyment of his property or <u>strata</u> without impinging upon the right of other owners, where the owner of the surface has neglected to guard his own rights in the deed by which he granted the lower strata to other owners."). In other words, the rights that the <u>Chartiers Block Coal</u> court determined grew from the contract of sale grew from implication, not the expressions of the parties. Thus <u>Einsig's</u> reference to "rights flowing from contracts of sale" should be read to include not only rights expressly provided for by the parties's agreements, but also those that the court in <u>Chartiers Block Coal</u> believed were implied, i.e. damages to the coal estate for necessary interferences with coal mining.

J-W Operating's final argument – that Allegheny should have utilized the permitting procedures of the Oil and Gas Act to object to the location of J-W Operating's well, not a suit for damages – seems to this Court similarly off-target. J-W Operating has pointed to no new provision of the Oil and Gas Act that would cause this Court to disagree with the court in <u>Einsig</u>, which concluded that the permitting authority (now the DEP) "cannot issue or deny a permit upon

consideration of which entity, the mining company or the well-driller, will be more

financially harmed, or proportionately more financially harmed, once it has

determined that the well may be safely drilled." 452 A.2d at 567. Rather, the

agency's authority "is limited to ascertainment of whether a well can be safely

drilled, and, if so, where on the driller's tract of land it can be located where it will

least interfere with or endanger the mine."  Id. at 568. Since Allegheny's

opposition to the location of the C-12H Well appears to be based on alleged

financial harm, not safety concerns, Allegheny cannot be rightly charged with

"lying in wait" by failing to participate in a permitting process that would be of no

aid to it.

Accordingly, the Court holds as a general matter that an oil and gas lessee

must compensate the owner of an above-located coal estate for otherwise useful

coal rendered inaccessible by oil and gas drilling. Because Allegheny concedes

there is a genuine dispute of material fact with respect to the amount of damages

alleged, summary judgment is denied as to damages.

**c.     Conversion and Intentional Interference with Contractual Relations**

Allegheny concedes that proving its conversion claim requires evidence

showing  J-W Operating's willful interference with a chattel, done without lawful

justification, depriving Allegheny of the chattel's use and possession. (Allegheny

31

Opp'n Br., Mar. 19, 2013, ECF No. 84 at 3 (hereinafter "Allegheny Opp'n Br.")).

Likewise, to prove intentional interference with contractual relations, Allegheny

admits that it must show "absence of privilege or justification on the part" of J-W

Operating. (Allegheny Opp'n Br. at 5). Coal in the ground is not a chattel,

Delaware & Hudson Canal Co. v. Hughes, 183 Pa. 66, 38 A. 568, 569 (1897),

which defeats Allegheny's conversion claim, and Chartiers Block Coal (assuming

compliance with subsequently enacted statutes) gives J-W Operating the right of

access to its Deep Rights "at all times," subject to be suspended only "during the

operation of the removal of the coal," defeating both of Allegheny's claims. 25 A.

at 599. Accordingly, J-W Operating's motion for summary judgment on

Allegheny's count III (conversion) and IV (intentional interference) should be

granted.

**d.    Summary**

In summary, Allegheny's motion for summary judgment is denied with

respect to Allegheny's counts I and II (both declaratory judgment), and III

(conversion), but granted as to its count V (interference with coal interests) except

for the amount of damages, if any. J-W Operating's motion for summary judgment

is granted as to Allegheny's counts I, II, III, and IV; denied as moot as to J-W

Operating's own counterclaim counts I (breach of warranty) and II (fraud); and

granted as to its own counterclaim count III (declaratory judgment).

## V.    Conclusion

For the foregoing reasons, the motion for summary judgment of plaintiff Allegheny Enterprises, Inc. (Jan. 25, 2013, ECF No. 63) is granted in part and denied in part, and the motion for summary judgment of defendant J-W Operating Company (Jan. 28, 2013, ECF No. 66) is granted in part and denied in part, in accordance with the accompanying Order of this date.

BY THE COURT:


s/Matthew W. Brann
Matthew W. Brann
United States District Judge